**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DONALD J. VARNER, | ) | |
| Plaintiff, | ) | Civil Action No. 12-1076 |
| | ) | |
| vs. | ) | Magistrate Judge Eddy |
| | ) | |
| BYUNGHAK JIN, MIN HI PARK, NEDRA | ) | |
| GREGO, IRMA VIHLIDAL, LOUIS S. FOLINO,) | | |
| DORINA VARNER, and RICHARD ELLERS, | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff, Donald J. Varner, an inmate currently incarcerated at the State Correctional

Institution at Mercer, Pennsylvania (SCI-Mercer), brings this pro se civil rights action pursuant to

42 U.S.C. § 1983, alleging that Defendants were deliberately indifferent to his serious medical

needs in violation of the Eighth Amendment to the United States Constitution from November 3,

2011 until November 20, 2012 when he was incarcerated at the State Correctional Institution at

Greene (SCI-Greene). Specifically, he alleges that he did not receive proper treatment for his

human papilloma virus (HPV) and three serious complications arising therefrom: a painful

swelling in his groin, a lump in his neck with severe pain in his ear and side of his head and

white spots around his lips and groin. He names two groups of defendants: 1) five individuals

employed by the Pennsylvania Department of Corrections (DOC), specifically Louis S. Folino,

Superintendent at SCI-Greene; Irma Vihlidal, Corrections Health Care Administrator (CHCA);

Nedra Grego, nursing supervisor; Richard S. Ellers, Director of the DOC's Bureau of Health

Care Services; and Dorina Varner, Chief Grievance Officer for the DOC (together, the

"Corrections Defendants"); and 2) two non-DOC individual defendants who were involved in

treating him, namely Dr. Byunghak Jin (medical director at SCI-Greene) and Dr. Min Hi Park

(together, the "Medical Defendants").

Currently pending for disposition are two motions for summary judgment, one filed by the Corrections Defendants and the other by the Medical Defendants. For the reasons that follow, the motions will be denied.

<u>Facts</u>

Prior to setting forth the facts in this case, it is necessary to review some legal principles that govern motions for summary judgment, prisoner civil rights cases and the burdens that parties bear. First, Defendants have submitted concise statements of material fact (ECF Nos. 105, 109) and appendixes in support (ECF Nos. 106, 110), which consist of various progress notes and physician's orders regarding Plaintiff's course of treatment at SCI-Greene, as well as reports of an x-ray of his cervical spine, a rectal swab test and an ultrasound of his head and neck. The concise statements purport to interpret various notes, symbols and abbreviations contained in the medical records; for example, the notation "sx" is rendered as ["symptoms"] in the concise statements. However, Defendants have not provided any supporting affidavits regarding the content of Plaintiff's medical records. The Court of Appeals has held that, "because this Court is unable to conclusively interpret the results of his exam, we are obligated to draw any reasonable inferences in [the plaintiff's] favor." <u>Abdul-Aziz v. Nwachukwu</u>, 523 F. App'x 128, 131 n.5 (3d Cir. Apr. 23, 2013) (citing Fed.R.Civ.P. 56(c)(2), <u>Reedy v. Evanson</u>, 615 F.3d 197, 210 (3d Cir. 2010)). <u>See also</u> <u>Pearson v. Prison Health Service</u>, 519 F. App'x 79, 82 (3d Cir. Mar. 11, 2013) ("it is [Dr.] McGrath's burden as the movant to show that there is no genuine issue of material fact. McGrath simply submitted Pearson's medical records, but there was no affidavit attesting to the authenticity or completeness of the records. McGrath did not

2

submit an affidavit describing his treatment of Pearson or explaining the reasons for the treatment and its timing.")

This observation is particularly relevant to Defendants' assertion that Plaintiff does not have HPV, in support of which they cite a March 13, 2012 clinical report of a rectal swab test. (ECF No. 105 ¶ 34; ECF No. 106 Ex. 4; ECF No. 109 ¶ 9(r); ECF No. 110 Ex. 1 at 11, Ex. 2 at 4.) Plaintiff disputes that this test was designed to recognize HPV and argues that its purpose was to check for abnormal cells that would indicate anal cancer caused by HPV.[1] Without supporting affidavits, this Court cannot conclusively interpret the results of this exam.

Moreover, Plaintiff has submitted a page of Progress Notes from March 4 and March 11, 2011 (these records were not submitted by any of the Defendants) and referred to the Progress Notes from March 17 and March 24, 2011, during which he received several "histofreeze" treatments for genital warts, which are caused by HPV. It is noted that the notes contain assessments of "HPV." (ECF No. 116 Exs. 1-2; see also Varner Aff. ¶ 12.[2]) Plaintiff also contends that Dr. Jin, Dr. Park and Nedra Grego have admitted that genital warts are caused by HPV. (Varner Aff. ¶ 22 & Jin, Park resp. req. admis. #3; Varner Aff. ¶ 32 & Grego resp. req. admis. #3.) Finally, Plaintiff asserts that he told various individuals after the rectal swab test that he had recurring genital warts, which Dr. Jin refused to freeze, further supporting the claim that he does have HPV. (ECF No. 113 Exs. 26, 30, 44, 62.) Defendants have not explained this

---

[1] Plaintiff's notes indicate that, on December 30, 2011, Dr. Jin asked him if he was a homosexual because if he was, Dr. Jin would perform an anal swab test to check for anal cancer. Plaintiff responded in the affirmative only to get the test done. (ECF No. 113 Ex. 17.) The test was not performed until March 8, 2012. ECF No. 106 Ex. 1 at 11, Ex. 2 at 4.
[2] ECF No. 113 Ex. 72. Remarkably, in response to Plaintiff's request for admission that he had received multiple treatments for genital warts, Drs. Jin and Park responded "This statement is Denied as the medical records speak for themselves." (Varner Aff. ¶ 21 & Jin, Park resp. req.

discrepancy within their own medical records.

Second, in responding to the Defendants' statements of fact, Plaintiff denies most of the statements and refers to his own version of each medical visit, contained within the Appendix filed at ECF No. 113-1. Each entry is signed and declared under penalty of perjury to be correct. Defendants have not responded to Plaintiff's statements. He has also submitted an affidavit in which he summarizes the events. (ECF No. 113 Ex. 72.) Thus, even if Defendants had supported their version of what the medical records contain with affidavits from the physicians, it could not be said that their version of events is undisputed. "[W]hen there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." Reedy, 615 F.3d at 210 (citation omitted).

Third, after responding to the Defendants' Concise Statements of Material Fact (ECF Nos. 118, 119), Plaintiff has submitted a section called "Separately Numbered Paragraphs of Other Facts Necessary for the Court to Determine Motion for Summary Judgment," in which he describes what happened since he was transferred to SCI-Mercer on November 20, 2012. Specifically, he relates that: he had an MRI performed on his neck (results inconclusive), had an ultrasound and subsequent surgery on his testicles performed by a urologist to remove an introverted cyst, and obtained permission to see both a dermatologist and an ENT. See also Varner Aff. ¶¶ 16-17, 20. The Medical Defendants have filed no response to these additional statements at all. The Corrections Defendants did file a response to these additional facts on October 1, 2013 (ECF No. 121), but they responded only that the statements were denied as "immaterial" because the events identified "occurred after Plaintiff was transferred from SCI-

admis. #2.)

Greene.  Consequently, these events have no bearing on the conduct attributed to the Corrections Defendants."  On October 8, 2013, Plaintiff filed a reply in which he argues that the statements are material because they demonstrate that he suffered an ongoing medical condition to which these defendants were deliberately indifferent (ECF No. 122).

In addition, Plaintiff has submitted updated information that he was seen by an ENT on September 19, 2013, but the ENT was unable to diagnose his medical condition and suggested he needed to see a neurologist.  He also has indicated that he was seen by a dermatologist on September 24, 2013, who stated that his spots were either vitiligo (a loss of skin pigmentation) or a thyroid disorder.  He further indicates that a September 27, 2013 thyroid specific blood test had abnormal results indicative of hyperthyroidism.  (ECF No. 125.)  Defendants have submitted no response to these additional facts, although they have admitted that the exam with the ENT occurred.

The Corrections Defendants cite no authority for their assertion that these recent events are immaterial and this Court is unaware of any support for this contention.  Plaintiff is not seeking to hold them liable for events that occurred after he was transferred to SCI-Mercer. Rather, he is citing subsequent events to support his claim that the treatment (or lack thereof) that he received at SCI-Greene constituted deliberate indifference to his serious medical needs.

Fourth, Defendants point out that Plaintiff was seen on 33 occasions during the period in question (ECF No. 105 ¶ 9; ECF No. 108 at 9 n.1).  The Court of Appeals has noted, however, that "the number of entries in the medical records does not necessarily demonstrate that [the prisoner] received constitutionally sufficient medical care."  Pearson, 519 F. App'x at 84 (inmate was the subject of 32 physicians' orders and 72 progress notes).

Bearing all of these principles in mind, the following facts are taken from Plaintiff's exhibits and affidavit and all inferences are drawn in Plaintiff's favor as the non-moving party. These facts do not represent a complete report of every medical visit, but are only a sample that demonstrates the existence of genuine issues of material fact.

Plaintiff was incarcerated at SCI-Greene from August 1, 2007 until he was transferred to SCI-Mercer on November 20, 2012. (Varner Aff. ¶ 2.) He states that he contracted HPV before he was incarcerated at SCI-Greene, but did not become aware of this fact until he noticed small venereal warts beginning to appear. At this point, he began doing as much research as he could on HPV, including writing to the Center for Disease Control, the health department and various other organizations. (Varner Aff. ¶ 3.) Through his research, he learned that HPV is known to cause cancers of the head and neck, penis and rectum, and he learned the warning signs and symptoms of these cancers long before he began to experience them. Then, when he began to experience some of the known signs and symptoms, he waited a little while to be absolutely certain, at which point he immediately notified the defendants and sought appropriate care. (Varner Aff. ¶¶ 4-5.) However, Defendants merely responded that he was "overreacting to an article that I read", when in fact they were "underreacting to the seriousness of my symptoms." (Varner Aff. ¶ 6.) See ECF No. 116 Ex. 4.

As noted above, Plaintiff received "histofreeze" treatments for venereal warts on March 4, 2011, March 11, 2011 and March 24, 2011, and assessments of "HPV" were made in the progress notes. He had follow-up visits regarding these treatments on March 17, 2011 and March 24, 2011. (ECF No. 116 Exs. 1-2.)

Plaintiff states that, during the summer of 2011, he began having internal pain in his groin

near white spots which he discovered were spreading on his scrotum. (Varner Aff. ¶ 7.) On

October 28, 2011, he began experiencing significant internal pain in the right side of his neck.

(Varner Aff. ¶ 8.)

On November 3, 2011, Plaintiff reports that:

I went to a sick call this morning for severe pain in my neck which I've had for a week now. I was seen by Dr. Jin. I told Dr. Jin on the sick call that I know that I have HPV... and it is known to cause cancer and that I believe I could be having possible warning signs of oro[]pharyngeal cancer. Dr. Jin felt my neck and said that he didn't feel anything abnormal. I told him that I was in pain and I showed him where it was coming from, I also told him that my neck feels swollen. Dr. Jin disregarded my concerns, he then looked in my mouth with a light and said that he didn't see anything. I then [pointed] out to him a white spot in my mouth that has been bothering me (which he totally missed) and he dismissed it and said it was simply an ulcer and it would go away.

I showed Dr. Jin an article that was published last month in Men's Health Magazine which directly states that HPV causes oro[]pharyngeal cancer and it mentioned the symptoms that are possible warning signs (some of which I'm having). Dr. Jin read the article right in front of me, therefor[e] he cannot deny his awareness of my condition and the correlation between my symptoms and my concerns. Dr. Jin dismissed the article and said that it was not a medical journal (the information in the article came from the New England Journal of Medicine) and he told me to throw the article away and not to worry about it. I told him that I fear[ed] for my life.

Dr. Jin mentioned doing an x-ray on my neck, which he did not do, he then said he would order a blood test, after that he told me to leave without even giving me anything for the pain I was in. I told Dr. Jin I was going to document everything that he said and did and his reply was "I'm not scared of documents", he again told me to get out of his office.

The entire experience with Dr. Jin was very unpleasant and he showed absolutely no concern for my well[-]being and dismissed everything that I told him. I received no diagnosis and no treatment but was charged five dollars for the sick call.

(ECF No. 113 Ex. 2.)

On November 22, 2011:

I went on a medical will call this morning and I saw Dr. Jin. I showed him the swollen lymph nodes on my hips and the white spots on my scrotum. He told me not to worry and that there was nothing wrong with me. I also told him that I

still had pain in my neck and he dismissed it and said not to worry about it. He said that he would call me up in 4 month[]s to check on the condition of my lymph nodes and he mentioned doing a biopsy then if necessary. I told him that was unacceptable as I was in pain now, then he kicked me out of his office and said to leave now.

(ECF No. 113 Ex. 10.)

On December 6, 2011:

I went on another sick call today about the pain in my neck and once again I saw Dr. Jin. Dr. Jin was giving me the same old song and dance run-a-round until Ms. Irma Vihlidal entered the room to have me sign[] a release of information form and I began speaking with her about my conditions. Dr. Jin then quickly ordered more bloodwork and an x-ray to be done and he immediately sent me out of his office and down the hall to have blood drawn. It was obvious that he did not want me talking to Irma Vihlidal and the sudden ordering of bloodwork and [sending] me down the hall for it on the spot was intended to prevent any further conversation between me and Irma Vihlidal (the healthcare administrator).

(ECF No. 113 Ex. 14.)

On January 13, 2012, Plaintiff was seen by Dr. Park, who told him "swollen lymph nodes not big trouble" and who said, when Plaintiff requested that he needed more urgency in his care, "this is not a medical center." (ECF No. 113 Ex. 19.) On January 19, 2012, Plaintiff saw Dr. Jin, who told him he did not have swollen lymph nodes, threatened to have him put in the Restrictive Housing Unit ("the hole") if he did not "shut up" and "went so far as to tell me that I'm not in pain" before ordering him to leave. (ECF No. 113 Ex. 21.)

On April 28, 2012, the pain in the right side of his neck progressed into the entire right side of his head including his right ear. (Varner Aff. ¶ 9.) On May 1, 2012, he was seen by Dr. Jin, who told him he had a "bad attitude." Irma Vihlidal was present and told him that the anal swab test report dated March 13, 2012 revealed that he did not have HPV. He tried to explain to her that the test was for anal cancer but to no avail. Later that day, he was sent to a psychologist,

who told him to "stop putting in sick calls, stop filing grievances, and stop having my family call here" or else "they would [label] me as problematic, put me in the hole (solitary confinement) and keep me there under (AC) administrative custody status." (ECF No. 113 Ex. 26.)

On May 9, 2012:

> I went on another sick call today for the severe pain in my neck to once again plead for help and ask for better pain medication. I was seen by physician's assistant Jennifer Trimai. She examined my neck and immediately located a lump/mass in the right side of my neck. As she was touching it Dr. Jin was walking by, she called him in the room to show him the lump in my neck and he refused to even touch me and said "oh, that's normal". Ms. Trimai looked at Dr. Jin as if he was crazy but could not say anything because he is her boss. However, the Corrections Officer (C.O. Caldwell) who was standing there and witnessed the whole thing also looked in disbelief. I then said to Dr. Jin "what about these white spots that just appeared around my mouth" and Dr. Jin replied "oh that's normal too". I said "show me someone else that has this". Dr. Jin had no response and began walking out of the room. Officer Caldwell, who was still standing at the door and witnessed the entire thing, looked at Dr. Jin as he walked out and said directly to him "you are a fucking idiot". Dr. Jin completely ignored him.

(ECF No. 113 Ex. 28.) On May 17, 2012, Plaintiff was directed to a conference room where four staff members awaited him: Irma Vihlidal, Dr. Jin, Dr. Khan (a psychologist) and David Yanak (possibly another psychologist). Plaintiff believes this conference was the result of the conversation he had with Superintendent Folino on May 15, 2012, in which he told Folino about the ongoing issues with his neck and the denial of treatment and Folino said he would look into it. (Compl. ¶ 75; ECF No. 113 Ex. 64.) At the conference, Plaintiff explained his symptoms to the group and asked to see an ear, nose and throat specialist. He relates that: "Irma Vihlidal said 'what if we don't let you see a specialist', I replied 'then I will have to sue you'. Irma Vihlidal said "okay." Dr. Khan asked to see the white spots on his scrotum and they went into another room; he also showed Dr. Khan a genital wart that was growing back but Dr. Jin refused to give

him freeze treatments for. Plaintiff was left sitting in the hallway and eventually ordered back to his cell. (ECF No. 113 Ex. 29.)

In addition, Plaintiff has recorded that, on many occasions Dr. Jin and Dr. Park noted his swollen lymph nodes and told him they were "nothing to worry about" (ECF No. 113 Exs. 12, 16, 17, 19, 21, 23, 28, 32, 34, 48); that he was told he did not have HPV even when he pointed out that he had a recurring genital wart which Dr. Jin refused to treat (ECF No. 113 Exs. 26, 30, 44, 62); that Dr. Jin reduced and occasionally eliminated his pain medication despite the fact that he had increasing pain (ECF No. 113 Exs. 16, 28, 29, 30, 32, 36, 38, 42, 46, 47, 48, 54, 55, 60, 62, 63); that Dr. Jin threatened to have him sent for a psychological evaluation and actually did so on several occasions (ECF No. 113 Exs. 22, 26, 28, 32, 34); and that Dr. Jin and others threatened to put him in the Restricted Housing Unit ("the hole") if he did not stop complaining about medical problems (ECF No. 113 Exs. 21, 22, 26).

Plaintiff has also submitted correspondence between his brother, Eric Varner, who wrote of his concern particularly regarding the lump in Plaintiff's neck and the pain spreading into his head and ear, and SCI-Greene staff. Specifically, Eric Varner wrote to express his concerns to Superintendent Folino on May 31, 2012 (ECF No. 113 Ex. 65). On June 11, 2012, a letter in response was written by Richard Ellers, Director of the Bureau of Health Care Services, to say that staff "are unable to discuss his medical care without a written release per PA DOC policy [but] We can assure you that we have discussed his medical needs with the staff at SCI-Greene and encourage you to contact Mrs. Vihlidal regarding this matter. It has been determined that the care being provided to you[r brother] by the staff at SCI-Greene is medically appropriate." (ECF No. 113 Ex. 66.)

On August 2, 2012, Eric Varner wrote again to Superintendent Folino, concerned about the "palpable lump" on the right side of Plaintiff's neck and the severe pain it was causing. (ECF No. 113 Ex. 68.) On August 22, 2012, Superintendent Folino responded that, "although the report indicates there is a 'lump' in the right side of Donald's neck, the ultrasound found no abnormality. Based on these findings no further treatment is necessary at this time." (Id. Ex. 69.) On September 5, 2012, Eric Varner wrote:

> These two statements seem contradictory, can you explain how the presence of a "lump" in someone's neck is not considered "abnormal"[?] I know I do not have one in my neck. I was first told there was no lump in his neck. Now that it has been confirmed that a lump is present, Please explain to me how a "lump" in his neck that has been causing a radiating pain into his ear and the side of his head, which has also been getting worse as time passes is not considered "abnormal" and worthy of further testing?

> Please, Louis I am pleading with you to have this looked at further. My brother is not trying to make trouble and is not making this up. He would not go through all this trouble if something were not seriously wrong. I can hear the pain in his voice when he calls home and my whole family just wants to cry. I beg you again to please help him get proper treatment.

(Id. Ex. 71.)

As noted above, on November 20, 2012, Plaintiff was transferred to SCI-Mercer. He indicates that: on November 27, 2012, an MRI was ordered to be performed on his neck; on December 12, 2012, an ultrasound was performed on his testicles which identified an "abnormal lump" which was the cause of his groin pain; on February 20, 2013, the MRI was performed, but failed to identify the condition causing the prolonged pain in his right head, neck and ear; on May 13, 2013, he underwent surgery for a hydrocele and an introverted cyst, which the urologist indicated was growing inward and would have caused him significant pain; on May 28, 2013, he was informed that the ENT consult was denied by the health care provider; on June 17, 2013, a

urologist conducted a follow-up exam and told Plaintiff he was unable to diagnose the white spots spreading on his scrotum and he needed to see a dermatologist; on July 9, 2013, Dr. Scott Morgan again prescribed that Plaintiff be examined by an ENT and on July 26, 2013 a grievance procedure permitted this consultation; on September 19, 2013, the ENT indicated that she was unable to make a diagnosis and that Plaintiff might need to see a neurologist; on September 24, 2013, a dermatologist examined the white spots and stated that he believed Plaintiff had vitiligo but that it could also be consistent with a thyroid disorder; and on September 27, 2013, a thyroid specific blood test had abnormal results indicative of hyperthyroidism.  (ECF No. 118 at 8-9; ECF No. 125; see also Varner Aff. ¶¶ 16-17, 20.)

Procedural History

Plaintiff initiated this action by filing a motion to proceed in forma pauperis on July 31, 2012 (ECF No. 1).  The motion to proceed IFP was granted (ECF No. 4) and the complaint was filed on August 8, 2012 (ECF No. 5).  Federal question jurisdiction is asserted based on the civil rights claim, 28 U.S.C. § 1331, and the complaint alleges that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution.

On July 15, 2013, motions for summary judgment were filed by the Corrections Defendants (ECF No. 103) and the Medical Defendants (ECF No. 107).  Plaintiff filed his response in opposition (containing the appendix) on August 19, 2013 (ECF No. 113) and filed briefs in opposition to the motions on September 12, 2013 (ECF Nos. 116, 120).  Although a scheduling order permitted Defendants to file reply briefs if they so desired by September 26, 2013 (ECF No. 114), no reply briefs were filed.

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide

that: "The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts

sufficient to establish the existence of any element essential to that party's case, and for which

that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986). The moving party bears the initial burden of identifying evidence which demonstrates

the absence of a genuine issue of material fact. Once that burden has been met, the non moving

party must set forth "specific facts showing that there is a genuine issue for trial" or the factual

record will be taken as presented by the moving party and judgment will be entered as a matter of

law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is

genuine only if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the

non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's

favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County

of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The Medical Defendants argue that the records demonstrate that they were not

deliberately indifferent to Plaintiff's serious medical needs because they saw him numerous

times, examined him and prescribed tests. The Corrections Defendants argue that: 1) Plaintiff

cannot establish liability for them because they had no personal involvement in the underlying

deprivations of rights alleged by Plaintiff, such as reviewing his inmate grievances; 2) the only Corrections Defendant who is even allegedly included in his claim is Vihlidal, the Corrections Health Care Administrator at SCI-Greene, and there is no support for the claim that she was deliberately indifferent in her role of responding to complaints and grievances and providing Plaintiff's brother with information, but in any event his own allegations indicate that he was seen more than 30 times over a nine-month period, and thus there is no basis for a claim that anyone was deliberately indifferent to his medical needs.

Plaintiff responds that many of these medical visits consisted of Dr. Jin and Dr. Park refusing him treatment, reducing and denying his pain medication, threatening him with "the hole" and sending him to psychological evaluations. In addition, he argues that he has pointed to evidence that Vihlidal, as well as Superintendent Folino, Nedra Grego, Dorina Varner and Richard Ellers, were all involved in the events that occurred at SCI-Greene.

<u>Section 1983 Claims</u>

Plaintiff invokes the civil rights statute to state claims under the Eighth Amendment. It is provided in 42 U.S.C. § 1983 that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

The Supreme Court has held that § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." <u>Baker v. McCollan</u>, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed."

Albright v. Oliver, 510 U.S. 266, 271 (1994).  See also Baker, 443 U.S. at 140; Graham v. Connor, 490 U.S. 386, 394 (1989).

However, "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands.  Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character.  Rather, we examine each constitutional provision in turn."  Soldal v. Cook County, Illinois, 506 U.S. 56, 70 (1992).

### Eighth Amendment

The Eighth Amendment protects against the infliction of "cruel and unusual punishment." U.S. Const. Amend. 8.  This provision has been made applicable to the states by the Fourteenth Amendment.  Robinson v. California, 370 U.S. 660 (1962).  Plaintiff's claims of inadequate treatment and medical care during his incarceration at SCI-Greene implicate the Eighth Amendment.

All Defendants argue that Plaintiff has failed to demonstrate that they were deliberately indifferent to his serious medical needs and that the documentation attached to the complaint and to their motions demonstrates that he received frequent medical care but that he simply disagrees with the care he received, which is insufficient.  In addition, the Corrections Defendants contend that he has not demonstrated their personal involvement in the complained-of conduct merely because one of them was involved in the grievance process.  The Medical Defendants also argue that Plaintiff's claims for punitive damages should be dismissed.

Plaintiff responds that he has pointed to evidence from which the trier of fact could conclude that Defendants were deliberately indifferent to his serious medical needs, including the

fact that once he was transferred to SCI-Mercer, he began to see the specialists he had been

requesting to see and he had an MRI performed on his neck, had an ultrasound and subsequent

surgery on his testicles performed by a urologist to remove an introverted cyst, and obtained

permission to see a dermatologist and an ENT.  He also argues that he has alleged involvement

by all of the defendants and that the Corrections Defendants are responsible because they were

notified that he was receiving no treatment at all from the Medical Defendants.

Deliberate Indifference to Serious Medical Needs

The Court of Appeals for the Third Circuit has stated that:

> In Estelle, the Supreme Court held that the Eighth Amendment proscribes
> deliberate indifference to prisoners' serious medical needs. In order to establish a
> violation of [a prisoner's] constitutional right to adequate medical care, evidence
> must show (i) a serious medical need, and (ii) acts or omissions by prison officials
> that indicate deliberate indifference to that need.

Natale v. Camden County Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Estelle

v. Gamble, 429 U.S. 97, 103-04 (1976) (other citation omitted).  The Court of Appeals has

further stated that:

> the concept of a serious medical need, as developed in Estelle, has two
> components, one relating to the consequences of a failure to treat and one relating
> to the obviousness of those consequences. The [prisoner's] condition must be
> such that a failure to treat can be expected to lead to substantial and unnecessary
> suffering, injury, or death. Moreover, the condition must be "one that has been
> diagnosed by a physician as requiring treatment or one that is so obvious that a lay
> person would easily recognize the necessity for a doctor's attention."

Colburn v. Upper Darby Township, 946 F.2d 1017, 1023 (3d Cir. 1991) (quoting Monmouth

County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (MCCII)).

A prison official acts with deliberate indifference to a prisoner's medical needs only if he

or she "knows of and disregards an excessive risk to inmate health or safety."  Farmer v.

16

Brennan, 511 U.S. 825, 837 (1994).   The Court of Appeals has held that:

> the Estelle "deliberate indifference to serious medical needs" standard is clearly
> met when a doctor is "intentionally inflicting pain on [a] prisoner[ ]."  In MCCII,
> we identified several other scenarios that satisfy Estelle. Most relevant to this case
> are (1) "[w]here prison authorities deny reasonable requests for medical treatment
> ... and such denial exposes the inmate 'to undue suffering or the threat of tangible
> residual injury,' " MCCII, 834 F.2d at 346 (quoting Westlake v. Lucas, 537 F.2d
> 857, 860 (6th Cir. 1976)), and (2) "where 'knowledge of the need for medical care
> [is accompanied by the] ... intentional refusal to provide that care,' " id. (quoting
> Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir. 1985)) (alterations in
> original).

Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (quoting White v. Napoleon, 897 F.2d 103,

109 (3d Cir. 1990)).   "Mere disagreements as to the proper medical treatment [do not] support a

claim of an eight amendment violation."  MCCII, 834 F.2d at 346.   "Allegations of medical

malpractice are not sufficient to establish a constitutional violation."  Spruill, 372 F.3d at 235

(citations omitted).

Defendants do not contend that Plaintiff's conditions did not present a serious medical

need and the Court concludes that they did.  Nevertheless, they argue that he has not supported

his claims that they were deliberately indifferent to these needs.

As the presentation of facts above indicates, however, it is the Defendants who have

failed to meet their burden of demonstrating that there are no genuine issues of material fact.

Taking the facts in the light most favorable to Plaintiff as the non-moving party, it appears that,

although he was "seen" on numerous occasions by Dr. Jin, Dr. Park and others, the visits

consisted of the same quick exam which noted swollen lymph nodes, a lump in the right side of

his neck and white spots on his groin and around his mouth, which the doctors pronounced was

"nothing to worry about."  More troubling, the visits became confrontational, and Plaintiff was

threatened with being put in solitary confinement or being sent to a psychologist, as he

sometimes was. Defendants continued to insist that he did not have HPV even when he pointed out that he still had genital warts, which they admit are caused by HPV. His pain medications were often reduced and occasionally eliminated and on one occasion Dr. Jin told him he was not in pain.

Finally and most tellingly, after Plaintiff was transferred to SCI-Mercer on November 20, 2012, he began receiving the very care that Defendants had refused to provide for him at SCI-Greene, namely referrals to specialists including an ENT, a dermatologist, and a urologist. He had an ultrasound performed and then surgery to remove an introverted cyst in his groin. He had a thyroid specific blood test performed that revealed abnormal results indicative of hyperthyroidism.

Given this presentation of the facts, Defendants have not and cannot demonstrate that there are no genuine issues of material facts. This case must proceed to trial for the jury to determine whether Defendants were deliberately indifferent to Plaintiff's serious medical needs.

<u>Involvement of Various Defendants</u>

The Corrections Defendants contend that only Irma Vihlidal was involved in Plaintiff's care and there is no support for the claim that she was deliberately indifferent in her role of responding to complaints and grievances and providing Plaintiff's brother with information. There is evidence in the record, however, that Vihlidal: told him he did not have HPV and refused to listen to his evidence to the contrary and told him that he could not see a specialist.

In addition, Plaintiff has presented evidence that Superintendent Folino, Nedra Grego, Richard Ellers and Dorina Varner were involved in the events relating to his treatment at SCI-Greene. On December 21, 2011, Nedra Grego denied a grievance Plaintiff had filed on

December 1, 2011, stating that:

> I reviewed the sick call notes and it is noted that you have complained of neck pain on 11/3/11 and was afraid that you had throat cancer. Dr. Jin assessed your symptoms and ordered you lab work. On 11/17/11 you complained of throat pain, not neck pain. Again you were concerned about cancer. PA West ordered you Motrin for pain and more lab work. You then complained of swollen lymph nodes noted in your later sick calls and was referred to Dr. Jin. Dr. Jin assessed you on 11/22/11 and there were no swollen lymph nodes noted anywhere on your body. Dr. Jin reviewed your lab work and assured you there was no sign or symptoms of cancer. You continue to have negative findings for any cancer. An x-ray was ordered of your neck and showed no acute disease. You do not require a "specialist" as you claim in your grievance to examine you.

(Compl. Ex. 6.) As Plaintiff notes, this is factually inaccurate, because, inter alia, his sick call request dated November 17, 2011 stated "I've also had persistent pain in my neck for 3 weeks now." (ECF No. 113 Ex. 9.) He also noted that he was repeatedly told there nothing wrong with him until his eighth sick call visit, that Dr. Jin said he felt nothing abnormal upon examining him on November 3, 2011 and mentioned doing lab work and an x-ray but did neither, and that his swollen lymph nodes were observed on several occasions and Dr. Jin's response was to say he would check on them in four months. (Compl. Exs. 7-8.)

Plaintiff pointed out these inaccuracies to Superintendent Folino, on second-level review filed on December 27, 2011, but Superintendent Folino confirmed the denial of his grievance on January 27, 2012, stating "Your appeal and request to see a specialist is hereby denied." (Compl. Exs. 7, 8, 9.) Plaintiff filed a final-level appeal with Chief Grievance Officer Dorina Varner on February 8, 2012, she referred it to Richard Ellers at the Bureau of Health Care Services on February 24, 2012, and the grievance was denied on March 8, 2012. (Compl. Exs. 10, 11, 12.)

The Corrections Defendants argue that these individuals were only involved in reviewing grievances Plaintiff filed to complain about treatment he had received. However, Plaintiff has

presented evidence that these grievances were filed to obtain treatment during an ongoing process, specifically his request to see a specialist. "Where a grievance alleges an ongoing constitutional violation, a supervisory defendant who reviews it is personally involved in that violation because he is confronted with a situation he can remedy directly." <u>Carter v. Smith</u>, 2009 WL 3088428, at *6 (E.D. Pa. Sep. 23, 2009) (quoting <u>Harnett v. Barr</u>, 538 F. Supp. 2d 511, 524-25 (N.D.N.Y. 2008)).

In addition, as noted above, Superintendent Folino and Richard Ellers communicated with Plaintiff's brother, telling him that the lump in his neck was not "abnormal" and assuring him that Plaintiff was receiving proper medical care. Thus, the record contains sufficient evidence of their involvement to deny their motions for summary judgment.

For these reasons, the motions for summary judgment filed by the Corrections Defendants and the Medical Defendants will be denied. An appropriate order follows.


Eddy, M.J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DONALD J. VARNER,                          )
               Plaintiff,                    )                    Civil Action No. 12-1076
                             )
               vs.                          )                    Magistrate Judge Eddy
                             )
BYUNGHAK JIN, MIN HI PARK, NEDRA           )
GREGO, IRMA VIHLIDAL, LOUIS S. FOLINO,)
DORINA VARNER, and RICHARD ELLERS,   )
               Defendants.                   )

## ORDER

       **AND NOW**, this 22nd  day of January, 2014, for the reasons identified above,

       **IT IS HEREBY ORDERED** that the motion for summary judgment filed by

Defendants Richard Ellers, Louis S. Folino, Nedra Grego, Dorina Varner and Irma Vihlidal (ECF

No. 103) is **denied**.

       **IT IS FURTHER ORDERED** that the motion for summary judgment filed by

Defendants Byunghak Jin and Min Hi Park (ECF No. 107) is **denied**.


                                     s/Cynthia Reed Eddy
                                     CYNTHIA REED EDDY
                                     United States Magistrate Judge

cc:    Donald J. Varner
        HB-8538
        SCI Mercer
        801 Butler Pike
        Mercer, PA 16137

J. Eric Barchiesi
Eisenberg & Torisky
Email: eric.barchiesi@aig.com


Scott A. Bradley
Office of the Attorney General
Email: sbradley@attorneygeneral.gov